**No. 25-7162**

---

In the United States Court of Appeals
for the Ninth Circuit

---

Feindt, et al.,
　　　　　　　　　Plaintiffs—Appellants,

v.

United States of America,
　　　　　　　　　Defendant—Appellee.

---

Appeal from the United States
District Court for the District of Hawaii
Case No. 1:22-cv-00397-LEK-KJM;  Case No. 1:22-cv-
00457-LEK-KJ;  Case No. 1:22-cv-00059-LEK-KJM

---

**Appellants' Opening Brief**

---

Lyle Hosoda
Hosoda Law Group
3 Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, HI 96813
(808) 524-3700

Frederick C. Baker
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, TX 77002
(713) 364-6640

Kristina S. Baehr
Just Well Law, PLLC
2606 W 8th Street, Unit 2
Austin, TX 78703
(512) 994-6241

Counsel for Appellants

## Table of Contents

Table of Contents..............................................................................................i

Table of Authorities ......................................................................................iii

Jurisdictional Statement ................................................................................ 1

Issues Presented............................................................................................ 2

Statement of the Case ................................................................................... 3

I.      The Government contaminated the *Red Hill* Children's water. ................... 3

II.     Procedural Posture................................................................................ 4

     A.     A bellwether bench trial occurred. ....................................................... 4

     B.     The Government stipulated liability .................................................... 5

     C.     The *Red Hill* Children proved very extensive damages. ...................... 5

          1.     B.D.'s suffering is worth far more than $21,000....................... 6

          2.     V.D.'s suffering is worth far more than $11,000....................... 7

          3.     P.G.F.'s suffering is worth far more than $16,000. ................... 8

          4.     T.F.'s suffering is worth far more than $4,000. ....................... 9

          5.     D.F.'s suffering is worth far more than $11,000. ................... 10

          6.     D.J.'s suffering is worth far more than $6,000. ....................... 11

          7.     N.J.'s suffering is worth far more than $11,000....................... 11

     D.     The District Court made very low damage findings .......................... 12

Summary of the Argument...................................................................... 15

Argument ............................................................................................... 19

I.    The district court's damage findings used three legally invalid methods.....20

    A.    The court clearly erred by imposing a legally invalid proof
          requirement to recover emotional-distress damages..........................20

          1.    *Zhang* and *Tortu* forbid "independent proof" requirements. ..20

          2.    The court imposed errant independent-proof requirements. ..21

                i.    Infants suffer even if they cannot explain it. .................23

                ii.   Evacuation and disruption are consequences of
                      poisoning a home, not independent phenomena. ..........24

          3.    The use of false proof requirements is clear error....................25

    B.    The district court clearly erred by reducing documented acute
          poisoning to near-nominal awards. ....................................................26

          1.    The court's causation and injury findings establish
                entitlement to real, not nominal, compensation. ....................26

          2.    The four-figure awards are effectively nominal and cannot be
                reconciled with those findings. .................................................27

          3.    Unexplained remedial nullification is clear error. ...................30

    C.    The awards are internally inconsistent. ............................................. 31

          1.    The flat $1,000 hedonic award ignores the court's own
                individualized findings............................................................ 31

          2.    Comparable minors received materially different awards
                without corresponding differences in found injuries...............33

          3.    Internal inconsistency is clear error. ........................................34

Conclusion ...........................................................................................................36

Certificate of Compliance .........................................................................................2

# Table of Authorities

## Cases

*Castro v. Melchor*,
    142 Hawaiʻi 1, 414 P.3d 53 (2018) ...................................................... 32

*Doe Parents No. 1 v. State, Dep't of Educ.*,
    100 Hawaiʻi 34, 58 P.3d 545 (2002) ..................................................... 25

*Felder v. United States*,
    543 F.2d 657 (9th Cir. 1976) ............................................................... 35

*Tortu v. Las Vegas Metropolitan Police Department*,
    556 F.3d 1075 (9th Cir. 2009) .....................................................*passim*

*United States. v. English*,
    521 F.2d 63 (9th Cir. 1975) ................................................................. 30

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) ....................................................*passim*

*Zhang v. American Gem Seafoods, Inc.*,
    339 F.3d 1020 (9th Cir. 2003) ....................................................*passim*

## Statutes

28 U.S.C. § 1291 ............................................................................................. 1

28 U.S.C. § 1346(b)(1) ................................................................................... 1

28 U.S.C. §§ 2671-2680 ................................................................................. 1

## Rules

Fed. R. Civ. P. 52(a)(6) ................................................................................ 19

## Jurisdictional Statement

28 U.S.C. § 1346(b)(1) supplies the district court's subject-matter jurisdiction because this action involves personal injury and property claims against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680. 1-ER-6, 166-67.

28 U.S.C. § 1291 supplies this Court's appellate jurisdiction because a timely notice of appeal, 18-ER-1873(filed November 11, 2025), challenged the Document 636 Order and Final Judgment of September 9, 2025, 1-ER-2, which constitutes a final decision as to all of the bellwether plaintiffs at issue.

Appellants here are Patrick Feindt, Jr., as Next Friend to his minor child, P.R.F.; Patrick Feindt, Jr. as Next Friend to his minor child, P.G.F.; Nastasia Freeman, as Next Friend to her minor child, D.F.; Richelle Dietz, as Next Friend to her minor child, V.D.; Richelle Dietz, as Next Friend to her minor child, B.D.; Sheena Jessup, as Next Friend to her minor child, N.J.; and Sheena Jessup, as Next Friend to her minor child, D.J. *Id.*

## Issues Presented

The United States contaminated the water supply of seven young children in military housing with jet fuel. Their Government—whose negligence is stipulated—reassured their families the water was safe while they drank it, cooked with it, and bathed in it. One twenty-month-old boy developed uncontrollable vomiting, dry heaving, and trouble breathing severe enough that his parents pulled over on the drive to the emergency room. His two-year-old sister lost bowel control overnight, projectile vomited through the morning, and regressed in toileting and language.

In the resulting FTCA bellwether trial, the United States stipulated negligence and the district court found that the spill legally caused acute physical injuries. But its damages findings for these seven young children were near nominal.

The question presented is whether the district court used a clearly erroneous legal standard by employing an unstated, methodologically invalid approach to noneconomic damages that (1) required standalone proof of emotional distress rather than drawing distress as an inference from proven ongoing physical injuries and surrounding circumstances, (2) yielded nominal-range awards because the court never explained how its injury findings produced the numbers it selected, and (3) produced outcomes that cannot be reconciled internally—including a flat hedonic figure and unexplained spreads among similarly situated minors.

## Statement of the Case

### I.     The Government contaminated the *Red Hill* Children's water.

On November 20, 2021, a rover train ruptured a fire-suppression transfer line at the Red Hill Bulk Fuel Storage Facility—an underground Navy complex beneath Joint Base Pearl Harbor-Hickam. 1-ER-6 at 3-4; 1-ER-8-9. JP-5 jet fuel flowed into the Red Hill Shaft and the 250-mile water distribution system serving thousands of military families. 1-ER-6 at 4; 1-ER-9. Within ten days, an estimated 2,000 to 2,500 gallons of jet fuel had entered the system at concentrations roughly 25 times Hawaiʻi's environmental action levels. 14-ER-1872, 1911-12.

The Government did not warn residents—it reassured them. Although the families on the waterline complained of a strange smell and sheen in their water, on November 28, the Navy publicly stated there was "no indication that the water is not safe," while omitting the fuel release eight days earlier. 14-ER-1885. On November 29, the base's Commander reiterated the message and told residents leadership was "drinking the water on base." 14-ER-1885. A November 30 communications plan directed officials to keep the same line. 14-ER-1886. The Government issued no "do not use" notice and did not connect the release to the fuel smell until the December 5 town hall. 14-ER-1887. By then, thousands of

families—including the seven *Red Hill* Children that now appeal—had used the contaminated supply for days. 1-ER-6 at 5; 1-ER-10; 14-ER-2408-09.

The contamination produced immediate, widespread illness. In November and December 2021, 5,828 residents sought emergency or medical care for jet-fuel exposure symptoms, including rashes, gastrointestinal illness, neurological effects, and respiratory distress. 14-ER-1959-60; 16-ER-2409. More than a month later, a CDC/ATSDR survey found 86% of participants reported symptoms—and 66% of those reported symptoms lasting 30 days or more. 14-ER-1959-60.

## II.    Procedural Posture

### A.    A bellwether bench trial occurred.

This appeal arises from the bellwether phase of consolidated *Red Hill* litigation involving hundreds of claimants. 1-ER-6 at 2; 1-ER-7. The parties selected seventeen plaintiffs from five households—including eleven minors—to try causation and damages to the bench from April 29 to May 13, 2024. 1-ER-6 at 1-2, 1-ER-6-7. The parties agreed the resulting damages findings would guide resolution of the remaining cases. 17-ER-2664. At issue now are claims about the seven minors that appealed (via next friends): P.R.F, P.G.F, D.F., V.D., B.D., N.J., and D.J. *See* 18-ER-1873.

### B. The Government stipulated liability

Liability was not in dispute at trial. The United States stipulated to negligence. *See* 1-ER-6 at 162; 1-ER-167. It admitted breach of its duty to safely operate Red Hill, that the spill caused a compensable nuisance, and that its breach caused the plaintiffs to suffer injuries compensable under the FTCA. *Id.*

Trial addressed causation and damages only. On causation, the district court found by a preponderance of the evidence that the fuel release was a legal cause of each minor plaintiff's acute physical symptoms. 1-ER-6 ¶¶ 29-34; *see, e.g.*, 1-ER-6 ¶¶ 106-111; 1-ER-47 (T.F.'s acute illness requiring emergency care). The court further found that "Defendant is liable to Plaintiffs, and that Plaintiffs have proven Plaintiffs suffered general damages for pain and suffering." 1-ER-6 ¶ 28, 1-ER-176. Those findings are not challenged here and are accepted as settled.

### C. The *Red Hill* Children proved very extensive damages.

This section summarizes, child by child, the injury findings and supporting record evidence most relevant to the damages issues on appeal. The district court found the Fuel Release legally caused acute physical illness in each minor plaintiff. 1-ER-6 ¶¶ 29-34, 1-ER-176-78. The record also includes child-specific psychological evaluations linking the contamination and its predictable upheaval (evacuation, relocation, separation, disruption of care) to clinically significant mental-health effects. 14-ER-1926-27. The point here is not to relitigate liability or causation—

those are settled—but to show the mismatch between what the court found these children endured and what it awarded as damages.

### 1. B.D.'s suffering is worth far more than $21,000.

B.D. was thirteen at the time of the fuel release and lived with his family in Earhart Village. As a result of the Government's negligence, he drank, cooked with, bathed, and breathed in jet fuel. 16-ER-2492; 16-ER-2500; 16-ER-2380.

The contamination triggered acute, multi-system illness for B.D. He developed headaches, balance disturbance, nausea, vomiting, diarrhea, rashes, dry skin, sore throat, fatigue, and anxiety. 14-ER-1890-91; 14-ER-1965; 16-ER-2499-500; 16-ER-2507. His headaches spiked into a "massive uptick," lasted days, and led to vomiting. 16-ER-2499-500; 14-ER-1896. He reported neuropathy and impaired temperature sensation. 12-ER-1548. His father testified B.D.'s anxiety "went through the roof," and his neurologist attributed worsened migraines in part to that increased anxiety. 12-ER-1549; 12-ER-1613. Dr. Clark opined the contamination substantially contributed to B.D.'s anxiety and diagnosed Other Specified Trauma and Stressor Related Disorder. 12-ER-1526. B.D. then pulled back from activities for fear of triggering headaches and lost long hot showers—his established coping mechanism—because rationing made them unavailable. 12-ER-1549; 12-ER-1562; 16-ER-2499-502.

Ample evidence showed the full extent of B.D.'s damages. 16-ER-2380; 14-ER-1965; 14-ER-1890-91; 14-ER-1896; 16-ER-2492, 128-131, 136-139; 12-ER-1549, 68; 12-ER-1548-18, 31; 12-ER-1526. But the district court awarded only $20,000 in general damages and $1,000 in hedonic damages ($21,000 total). 1-ER-6 ¶¶ 29, 34, 1-ER-176, 1-ER-178.

### 2. V.D.'s suffering is worth far more than $11,000.

V.D. was five at the time of the fuel release and lived in the same Earhart Village household. She too drank, ate food cooked with, bathed in, and breathed in jet fuel. 16-ER-2492; 16-ER-2500; 16-ER-2380.

After exposure, V.D. developed abdominal pain, vomiting, diarrhea, cough, wheezing, shortness of breath, and rashes. 14-ER-1890-91; 14-ER-1965 at 98(c); 14-ER-1965 at 108(c); 16-ER-2511. While bathing in the contaminated water, she screamed that her bottom hurt and later resisted bathing, saying the water burned her. 16-ER-2503; 12-ER-1572; 12-ER-1601. Government experts agreed she experienced emotional distress and recommended psychological care. 16-ER-2512.

Ample evidence showed the full extent of V.D.'s damages. 16-ER-2380; 14-ER-1965; 14-ER-1890-91; 16-ER-2491-521 [citing PX-2262_0001-0003]; 12-ER-1572, 66. Yet, the district court awarded only $10,000 in general damages and $1,000 in hedonic damages ($11,000 total). 1-ER-6 ¶¶ 29, 34, 1-ER-176, 1-ER-178.

### 3. P.G.F.'s suffering is worth far more than $16,000.

P.G.F. lived with her family on Ford Island. She drank, ate food cooked with, bathed in, and breathed in toxic jet fuel. 16-ER-2449; 16-ER-2380.

On December 13, 2021, she had loss of bowel control, experienced projectile vomiting, and developed an inability to keep down fluids, prompting an ER visit. 16-ER-2457-60. She continued coughing, abdominal pain, vomiting, and diarrhea into late December 2021. 13-ER-1758-59; 18-ER-2784. Her parents reported regression in toileting and language. 16-ER-2459. Her provider documented water-related post-traumatic symptoms and diagnosed Other Specified Trauma and Stressor Related Disorder. 12-ER-1531-35. Her therapist also diagnosed Other Specified Trauma and Stressor Related Disorder, and P.G.F. now refuses non-bottled water and carries her own bottle. 12-ER-1748; 13-ER-1787. Another medical provider attributed her acute illness and regression to the fuel release, and Government experts recommended psychological care. 14-ER-1965; 16-ER-2462.

Ample evidence showed the full extent of P.G.F.'s damages. 16-ER-2449, 2454-59; 16-ER-2380; 14-ER-1965; 12-ER-1531-35; 13-ER-1758-59, 104; 12-ER-1748; 18-ER-2784. Yet, the district court awarded only $10,000 in general damages, $4,953.36 in special damages, and $1,000 in hedonic damages ($15,953.36 total). 1-ER-6 ¶¶ 29-31, 34, 1-ER-176-77, 1-ER-178.

### 4. T.F.'s suffering is worth far more than $4,000.

T.F. was about one year old at the time of the fuel release and lived with his family on Ford Island. He drank, ate food cooked with, bathed, and breathed in jet fuel. 16-ER-2449; 16-ER-2463; 16-ER-2380.

After the family received notice to stop using the water, T.F. developed abdominal pain, nausea, vomiting, diarrhea, headaches, and an asthma exacerbation. 1-ER-6 ¶¶ 106-111; 1-ER-47; 16-ER-2463-97. On December 11, his vomiting was severe enough that his parents rushed him to the ER. 16-ER-2463-97. Later evaluation showed acute and chronic inflammation, and he now uses two inhalers daily. 16-ER-2464; 14-ER-1965. His provider attributed his acute illness and respiratory symptoms to the fuel release. 18-ER-2822; 16-ER-2421-22. Another provider diagnosed Other Specified Trauma and Stressor Related Disorder and documented separation difficulty and fear of doctors amid relocation disruption. 12-ER-1537-39; 12-ER-1676-706, 105; 13-ER-1713-810.

Ample evidence showed the full extent of T.F.'s damages. 16-ER-2449-79; 16-ER-2380; 14-ER-1965; 18-ER-2822; 12-ER-1537-39; 12-ER-1676-706, 105; 13-ER-1713-780. The district court awarded $3,000 in general damages and $1,000 in hedonic damages ($4,000 total). 1-ER-6 ¶¶ 29, 34, 1-ER-176, 1-ER-178.

### 5. D.F.'s suffering is worth far more than $11,000.

D.F. lived with his family in Aliamanu, where the household water smelled like fuel and had an oil-like film. Because the Government reassured the family that the water was safe, D.F. drank and bathed in the contaminated water. 16-ER-2422; 15-ER-2080; 12-ER-1411; 13-ER-1845-46.

After exposure, he had diarrhea, vomiting, and red eyes. 15-ER-2080; 16-ER-1436. His mother reported he regressed to diapers and lost speech, with deterioration in sleep and withdrawal. 16-ER-1436-37. His provider documented regression in speech and toileting and broader functional decline. 12-ER-1557-60. Another provider attributed his acute gastrointestinal illness to the fuel release. 14-ER-1965. The record also reflects seizures and tremors not present before exposure, with improvement noted after leaving Hawai'i. 16-ER-1436-37; 18-ER-2785.

Ample evidence showed the full extent of D.F.'s damages. 16-ER-2422, 65-68; 12-ER-1411-45; 13-ER-1845-47; 15-ER-2080; 12-ER-1557-60; 14-ER-1965; 18-

ER-2785. The district court awarded $10,000 in general damages and $1,000 in hedonic damages ($11,000 total). 1-ER-6 ¶¶ 29, 34, 1-ER-176, 1-ER-178.

### 6. D.J.'s suffering is worth far more than $6,000.

D.J. was about ten months old at the fuel release and lived in Radford Terrace in the Jessup household. He was exposed to toxic jet fuel by drinking, eating food cooked with, bathing in, and breathing in the air in his home. 12-ER-1580; 16-ER-2466; 16-ER-2380.

He suffered fever, vomiting, diarrhea, rash, and eye irritation. 14-ER-1891. His provider attributed portions of his acute symptoms to the fuel release. 14-ER-1965 at 96(l). Another provider emphasized the neurological vulnerability of babies, and the unknown long-term effects of toxic exposure during infancy. 12-ER-1580-14. The record also shows that D.J. was separated from his father for five months, as a result of relocation due to the fuel spill, and that he experienced an intense reaction even to his father's voice by phone. 13-ER-1791-92; 16-ER-2482.

Ample evidence showed the full extent of D.J.'s damages. 16-ER-2466; 12-ER-1580-89; 16-ER-2380; 14-ER-1965 at 96(l); 14-ER-1891-30; 13-ER-1791-92. The district court awarded $5,000 in general damages and $1,000 in hedonic damages ($6,000 total). 1-ER-6 ¶¶ 29, 34; 1-ER-176; 1-ER-178.

### 7. N.J.'s suffering is worth far more than $11,000.

N.J. was about four to five years old at the time of the jet fuel release and lived in Radford Terrace in the Jessup household. He was exposed to jet fuel by drinking, eating food cooked with, bathing in, and breathing in contaminated water in his home. 16-ER-2466; 16-ER-2482; 16-ER-2380.

He has autism spectrum disorder and cutaneous mastocytosis, and, at the time of the release, he still drank formula from a bottle, requiring substantial daily water use. 13-ER-1773-52; 16-ER-2497; 16-ER-2482. As a result of his exposure, he suffered abdominal pain, vomiting, diarrhea, burning eyes, headaches, cough, anxiety, and behavioral abnormalities, with burning-eye symptoms particularly notable during flushing events. 14-ER-1891; 14-ER-1965; 13-ER-1752. After purported clearance, he bathed at a Ford Island hotel and experienced burning pain and pigment loss on his legs. 13-ER-1793. The record reflects a major therapy gap after relocation due to the release, and that he experienced an extreme emotional meltdown while relocating. 13-ER-1751; 12-ER-1575-77.

Ample evidence showed the full extent of N.J.'s damages. 16-ER-2466-2528; 13-ER-1732-8321765-1865; 12-ER-1575-77; 16-ER-2380; 14-ER-1965; 14-ER-1891-30; 18-ER-2784. The district court awarded $10,000 in general damages and $1,000 in hedonic damages ($11,000 total). 1-ER-6 ¶¶ 29, 34, 1-ER-176, 1-ER-178.

### D. The District Court made very low damage findings

After making extensive, plaintiff-specific findings about exposure, symptom onset, severity, and duration, the district court translated those findings into damages awards organized as (1) general damages (pain and suffering, and for some plaintiffs emotional distress), (2) special damages, and (3) hedonic damages. 1-ER-6 ¶¶ 14-17, 28-34; 1-ER-171-72, 1-ER-176-78. For the six adult bellwether plaintiffs, the court's general-damages awards included both pain and suffering, as well as emotional distress—a component it excluded for all but one of the appealing minors. 1-ER-6 ¶¶ 28-29, 1-ER-176. The court awarded damages to the appealing minors as follows:

|  | General Damages | Special Damages | Hedonic Damages | Total Damages |
|---|---|---|---|---|
| B.D. | $20,000 | $0 | $1,000 | $21,000 |
| V.D. | $10,000 | $0 | $1,000 | $11,000 |
| *Feindt* | | | | |
| P.G.F. | $10,000 | $4,953.36 | $1,000 | $15,953.36 |
| T.F. | $3,000 | $0 | $1,000 | $4,000 |
| *Freeman* | | | | |
| D.F. | $10,000 | $0 | $1,000 | $11,000 |
| *Jessup* | | | | |
| D.J. | $5,000 | $0 | $1,000 | $6,000 |
| N.J. | $10,000 | $0 | $1,000 | $11,000 |

1-ER-176-78.

The court entered final judgment for the bellwether plaintiffs on August 7, 2025. 1-ER-2. A timely notice of appeal was filed by (next friends of) these minors: P.R.F, P.G.F, D.F., V.D., B.D., N.J., and D.J. 18-ER-2873.

The government did not cross-appeal. Its stipulation of negligence, the court's causation findings, and its determination that each minor plaintiff suffered compensable injury caused by the fuel release are now established. The only question is whether the court's dollar figures actually follow from—and can be reconciled with—those settled findings.

## Summary of the Argument

This appeal seeks correction of clear doctrinal and analytical error, not a quarrel over dollars. The district court's causation and injury findings are accepted. The flaw is the yardstick the court selected and the unexplained leap from injury findings to dollar figures. In this way, the district court erred for three independent reasons: (1) it imposed an invalid proof requirement for minors' emotional-distress damages; (2) it reduced found acute poisoning to near-nominal awards through an unstated yardstick; and (3) it issued internally irreconcilable noneconomic awards (a flat hedonic figure plus unexplained spreads among comparable minors).

A court may make credibility calls and choose among proven values; but it may not apply the wrong legal standard, skip findings-driven explanation, or replace individualized compensation with categorical proxies. Yet all of those matter-of-law errors happened here, causing clear error multiple times over.

The district court found the Government's negligence acutely poisoned eleven children and caused compensable injury. Yet its noneconomic awards do not follow from those findings through any stated, lawful method. The court applied an improper evidentiary gate for emotional distress, converted documented acute injury into nominal-range figures without explaining the translation, and produced results that are internally illogical.

The issue is not "too low." It is whether the court used the right legal framework. It did not—and the defect appears in three distinct forms.

*First*, the district court clearly erred by imposing an invalid proof requirement for emotional-distress damages. Children need not narrate trauma in adult terms; their distress flows from the acute physical injury and crisis circumstances the court itself found—poisoned water at home, sudden illness, medical intervention, and upheaval. But the court required standalone proof of distress apart from the injury narrative it credited, and it denied nearly all minors for failing to supply it. That is not a credibility determination; it is a legal mistake about what proof the law requires.

*Second*, the court clearly erred by reducing compensable acute injury to effectively nominal awards through an unstated yardstick. The law permits low awards only when they flow from articulated findings and a coherent valuation approach. But the district court awarded four-figure general damages for acute poisoning it found caused vomiting, respiratory distress, and emergency care—placing T.F. at $3,000, beneath the Government's own $5,000 minimum—without explaining how its findings produced that number. The court's methodology also produced a stark disparity: adults with the same categories of injury received tens of thousands of dollars, while children with comparable findings received only a few

thousand. That is not discretionary factfinding; it is a legal error in the method of translating findings into damages.

*Third*, the damage findings clearly erred by yielding severe contradictions. Valid findings need coherence: differences must be supported by findings, and identical awards must be justified by materially similar losses. But the district court here collapsed distinct losses into a single flat $1,000 hedonic figure for everyone, while simultaneously generating wide, unexplained spreads among children with materially similar injury profiles—without any stated metric, severity scaling, or findings-driven explanation. This too is a matter-of-law error, not credibility.

These are not isolated valuation disputes. They are structural defects in a bellwether template that will govern hundreds of remaining claims. If the template stands, the errors propagate. This Court should vacate and remand so the district court applies the correct legal framework and explains a findings-driven methodology capable of guiding the remaining cases.

The throughline is methodological clear error. Once the court accepted causation and injury, it had to apply the correct evidentiary standard and then transparently connect its findings to its figures; instead, it demanded the wrong kind of proof, delivered nominal-range awards without an explained yardstick, and produced irreconcilable internal inconsistencies. Those are not credibility calls.

They are legal defects in the decision rule that generated the awards. And bellwether trials raise the stakes: a flawed rule does not stay confined to eleven plaintiffs—it distorts bargaining, settlement baselines, and future adjudications across the sprawling *Red Hill* docket. The Court should vacate and remand for a coherent, findings-driven damages framework capable of serving the bellwether function.

## Argument

This appeal challenges the district court's damages findings—Findings 29-34, 1-ER-176-78, incorporated into the final judgment, 1-ER-3—as to the seven minor plaintiffs that have appealed.

Review is for clear error. Fed. R. Civ. P. 52(a)(6). The test is met by a "definite and firm conviction that a mistake has been committed." *Bechtel v. Liberty Nat'l Bank,* 534 F.2d 1335, 1342 (9th Cir. 1976) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948)). As put by *United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) (en banc), a damages finding is clearly erroneous when it is "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id.* at 1262 (cleaned up).

This is not a valuation quarrel. Appellants do not ask this Court to reweigh evidence, reassess credibility, or merely declare that the awards are shockingly low. The reversible error at issue is methodological and legal: the district court used an invalid proof gate for emotional distress, failed to explain any findings-driven way to translate its injury findings into dollar figures, and issued results that are internally contradictory. That kind of decision constitutes clear error under *Hinkson*'s test: outcomes that are "illogical," "implausible," or unsupported by record inferences cannot stand. *Hinkson*, 585 F.3d at 1262.

I.    **The district court's damage findings used three legally invalid methods.**

The district court's damages award to the *Red Hill* children rests upon three distinct mistakes that each constitute clear error. It (1) applied a legally invalid evidentiary gate to minors' emotional-distress damages; (2) converted findings of acute poisoning into essentially nominal awards by relying on an unarticulated metric; and (3) produced noneconomic awards that cannot be reconciled with its own findings (a uniform hedonic amount coupled with unexplained disparities among similarly situated children).

A.    **The court clearly erred by imposing a legally invalid proof requirement to recover emotional-distress damages.**

1.    ***Zhang* and *Tortu* forbid "independent proof" requirements.**

*Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003), holds that damages law imposes no "objective evidence requirement" for compensatory emotional-distress damages; distress may be shown by testimony or by "appropriate inference from the circumstances." *Id.* at 1030. *Tortu v. Las Vegas Metropolitan Police Department,* 556 F.3d 1075 (9th Cir. 2009), applies the same principle in the damages context: where the court finds wrongful conduct and physical injury, omitting attendant emotional distress "reflects an inaccurate view of the law" because distress may be "inferred from the circumstances." *Id.* at 1086-87.

20

The rule is thus categorical. Once the factfinder credits acute physical injury and a traumatic context, it must at least grapple with the inference of contemporaneous distress that accompanies those injuries and circumstances. A court may discount, apportion, or limit the award based on record-specific reasons. But it may not deny distress damages because plaintiffs failed to produce a separate, law-not-required "channel" of proof (e.g., expert corroboration or a particular form of parental observation). That is legal error reviewed without deference—not a credibility call insulated by Rule 52. *See Hinkson*, 585 F.3d at 1262.

### 2. The court imposed errant independent-proof requirements.

The district court expressly found the fuel release a traumatic event that caused emotional distress for "most" plaintiffs. 1-ER-92. It also made extensive, child-specific findings of acute physical injury caused by the fuel release—vomiting, respiratory distress, rashes, and ER-level episodes. *See, e.g.*, 1-ER-6. Yet it excluded every appealing minor except B.D. from emotional-distress recovery—including teenagers whom the court found suffered tremors, stuttering, depression, and cutting behavior after the spill. 1-ER-92. The court's rule has an especially perverse effect for the youngest plaintiffs. Infants and toddlers cannot testify to their distress; a rule demanding that testimony effectively denies recovery based on age alone.

That result tracks a legal mistake, not a factual finding of "no distress." The court did not ask the question *Zhang* and *Tortu* require—whether distress follows as an inference from the ongoing injuries and circumstances the court itself credited. Instead, it denied recovery because plaintiffs did not prove distress through a separate evidentiary route—expert testimony establishing long-term psychological injury or direct parental observation framed in clinical terms—apart from the acute *ongoing* physical harm the court already found. *See* 1-ER-104, 124, 126 (relying on Dr. Smith to reject long-term psychological injury). *Zhang* and *Tortu* do not allow a defense expert's retrospective view about future psychiatric needs to erase the immediate, attendant distress that accompanies acute poisoning in the home.

The court's child-by-child rationales confirm the same gatekeeping error. Properly grouped, they reduce to three repeating patterns—all incompatible with *Zhang*'s inferential standard. This is not a set of insulated, child-specific credibility calls. It is a single legal error—demanding independent proof of distress rather than considering distress inferable from proven injury and circumstances—that "contaminates" every award denying emotional-distress damages to minors despite the court's own findings. *See Tortu*, 556 F.3d at 1086-87; *Zhang*, 339 F.3d at 1030.

### i. Infants suffer even if they cannot explain it.

Infants cannot articulate fear, pain, or trauma in adult-like courtroom terms. A rule requiring that does not test the evidence—it excludes the very plaintiffs most vulnerable to the harm. Yet the district court imposed such an age-and-articulation screen, discounting distress because infants and young children did not present adult-legible reporting or later "need" mental-health services. That conflicts with *Zhang*'s inferential standard, which permits distress to be proved by testimony or inferred from circumstances—especially where the court itself finds acute injury and contemporaneous behavioral manifestations. *Zhang*, 339 F.3d at 1030.

For V.D., the court concluded plaintiffs had not proven the fuel release substantially caused her distress. 1-ER-6 ¶ 314; 1-ER-104. For D.J., the analysis was one sentence: he "was ten months old at the time of exposure and at the time of testimony did not need mental health services." 1-ER-6 ¶ 411; 1-ER-136. For D.F., it pointed to preexisting behavioral issues. 1-ER-6 ¶ 363; 1-ER-121.

*Zhang* forbids treating a child's limited articulation—or a parent's inability to label symptoms clinically—as a failure of proof. Distress may be inferred from behavior and circumstances. *Zhang*, 339 F.3d at 1030. A five-year-old who screams during baths because the water burns her skin (and later refuses to bathe) is exhibiting distress whether or not an adult can translate it into a diagnosis. 1-ER-6 ¶

311; 1-ER-104. An infant who suffers fever, vomiting, diarrhea, and rash from contaminated water has suffered in a way the law compensates regardless of later memory or need for therapy at trial. 1-ER-6 ¶ 411; 1-ER-136. By converting age and verbal limits into a proof barrier, the court reinstated the very independent-proof requirement *Zhang* rejects.

### ii. Evacuation and disruption are consequences of poisoning a home, not independent phenomena.

The district court severed causation by recasting evacuation, relocation, school disruption, and family separation as "independent" causes of distress rather than foreseeable consequences of poisoning families in their homes. *Tortu* forbids that move: when the court finds wrongful conduct and injury, it must account for the attendant emotional suffering inferable from the circumstances it credits, not treat those circumstances as reasons to zero it out. *Tortu*, 556 F.3d at 1086-87.

For N.J., it found relocation "disruptive" and "upsetting," but concluded plaintiffs had not shown the Fuel Release legally caused the move. 1-ER-6 ¶ 417; 1-ER-137; *see also* 1-ER-6 at 133. That framing again sidesteps the Zhang/Tortu inference by relabeling foreseeable consequences of acute poisoning as intervening "causes" that negate the tort. Under Hawaiʻi foreseeability-based proximate cause, contaminating the only water supply in military housing foreseeably forces evacuation and displacement, with predictable collateral harms—school disruption,

community severance, and family separation. *See Doe Parents No. 1 v. State, Dep't of Educ.*, 100 Hawai'i 34, 41 (2002). The district court found no superseding event breaking the chain. It simply refused to attribute the downstream disruption to the admitted wrong, thereby stripping the very circumstances that make the distress inference legally unavoidable.

### 3. The use of false proof requirements is clear error.

Once the district court found (1) negligent contamination, (2) acute physical injury to each minor, and (3) a traumatic context, *Zhang* and *Tortu* required it to at least grapple with the inference of attendant distress. The court did the opposite: it treated the absence of expert diagnosis, "need" for services, or adult-legible narration as a bar to recovery, and it severed causation by relabeling foreseeable spill consequences as "independent" causes. That is not discretionary valuation. It is an "inaccurate view of the law" that skews the factfinding process at the threshold. *Tortu*, 556 F.3d at 1086-87. Damages turn on injury proven by the record, not on whether the victim is old enough to testify about it.

That legal mistake also satisfies *Hinkson*'s clear-error criteria. A finding that children suffered compensable acute poisoning but "proved" no attendant distress—because they lacked later treatment or could not articulate it—rests on an illogical premise and is implausible in light of the court's own injury and

25

circumstances findings. *See Hinkson*, 585 F.3d at 1262. Because the court's denial of emotional-distress damages flowed from an invalid decision rule rather than a credibility determination, this Court should vacate and remand for application of *Zhang* and *Tortu*'s inferential standard to the minor plaintiffs' emotional-distress damages.

### B. The district court clearly erred by reducing documented acute poisoning to near-nominal awards.

After excluding emotional distress, the minors' general damages largely compensate physical pain and suffering alone—no emotional distress, no special damages, no lost earnings. The court valued acute poisoning severe enough to cause ER visits, multi-week illness, rashes, and respiratory distress at only $3,000 to $10,000. 1-ER-6 at 171-73, 1-ER-176-78. The court articulated no methodology tying its detailed injury findings to those low figures. That silence is the error.

### 1. The court's causation and injury findings establish entitlement to real, not nominal, compensation.

The court found that each appealing minor was exposed to contaminated water and suffered acute physical illness caused by the fuel release. Those findings describe real, compensable, ongoing injuries—documented acute symptoms and, for some, emergency medical evaluation—not technical harms. T.F. illustrates the point: the court found a three-week illness culminating in emergency care for uncontrollable vomiting, trouble breathing, and dry heaving, and treated the fuel spill

as the legal cause without apportionment. 1-ER-6 ¶¶ 106-111, 117; 1-ER-47. Once the court found compensable physical injury caused by negligence, it had to award damages that actually compensated for the injuries.

The district court's explicit 50/50 apportionment for preexisting conditions underscores its methodological failure. For children like T.F., N.F., and N.J., the court divided damages equally between the fuel release and preexisting conditions simply because it found "no evidence to base apportionment." 1-ER-6 at 44, 63, 82. But dividing an unstated, arbitrary base number by two does not cure a defective baseline. Halving an unexplained total still yields an unexplained total. More critically, the court applied this mechanical halving to acute symptoms—like projectile vomiting and burning skin—that the children were not actively experiencing prior to the poisoning. Treating acute, toxic trauma as a mere 50% aggravation of unrelated prior conditions contradicts the court's own findings of severe, immediate onset attributable to the contamination.

### 2. The four-figure awards are effectively nominal and cannot be reconciled with those findings.

A damages award that drops below the tortfeasor's own proposed minimum signals methodological failure, not permissible "calibration." T.F. is the clearest example: the court awarded $3,000 for an illness serious enough to require emergency care, even though the Government proposed $5,000. 1-ER-6 ¶ 29, 1-ER-

176. When the defendant's floor becomes the court's ceiling (or the court goes below it), the problem isn't valuation discretion; rather, the court has produced a figure untethered to any articulated evidentiary basis.

The disparity becomes even clearer when the minors' awards are compared to the adult awards issued in the same judgment. Adults received general-damages awards centered around tens of thousands of dollars, reflecting the court's valuation of acute poisoning, illness, and disruption from the contaminated water. But the minors—who the court likewise found suffered vomiting, respiratory distress, rashes, and medical intervention—were assigned four-figure figures instead. The findings identify no difference in injury categories, no shorter exposure pathway, and no diminished severity tied to age. The unexplained drop from adult-level compensation to child-level awards therefore cannot reflect findings. It reflects an unstated rule.

The court's strict temporal cutoff for compensable injuries cannot save these nominal awards. The district court arbitrarily halted causation for the minors' physical symptoms between December 3 and December 19, 2021. 1-ER-6 at 26, 44, 62. But even accepting those constrained one-to-three-week windows, valuing emergency-room interventions, loss of bowel control, and acute respiratory distress in toddlers at a few thousand dollars defies compensation principles. A condensed

timeline of acute, terrifying physical trauma concentrates the suffering; it does not nullify it. The court's failure to explain how it valued these severe, albeit compressed, periods of acute poisoning remains clear error.

T.F. is not an outlier. The Government proposed a minimum of $5,000 for each minor's combined "Loss of Enjoyment of Life & Disruption" alone—before any pain-and-suffering component. 17-ER-2565, Ex. B. The court awarded D.J. $5,000 in general damages and $1,000 in hedonic damages—$6,000 total for an infant who suffered fever, vomiting, diarrhea, rash, and eye irritation, with contemporaneous records confirming the contamination as the cause. 1-ER-6 ¶ 411; 1-ER-136. That total barely exceeds what the Government conceded for disruption alone. For V.D., the Government proposed up to $20,000; the court awarded $11,000. For P.G.F., the Government proposed up to $18,933; the court awarded $15,953.36. *See id.*

In each instance, the court's award lands at or near the bottom of the range the tortfeasor's own adversarial presentation identified—a range the Government set after contesting exposure, contesting causation, and arguing for maximum apportionment.

When the tortfeasor's *floor* becomes the court's *ceiling*, the inference of analytical error is strong. A factfinder may calibrate awards to duration. It cannot treat documented emergency-room presentations and loss of bodily functions as the equivalent of a brief stomach upset, then offer no explanation for the translation.

### 3. Unexplained remedial nullification is clear error.

This Court reverses FTCA damages when the district court "skips the step" from findings to dollars. In *United Sates. v. English*, 521 F.2d 63 (9th Cir. 1975), the court found the factual predicates for wrongful-death damages but failed to discount the award to present value; this Court held that methodological omission "clearly erroneous" and remanded, even though the underlying inputs were undisputed. *Id.* at 71-72. The same defect is present here: the court found acute physical injury, documented symptoms, and household disruption, then assigned four-figure sums without any articulated step connecting findings to figures. As in *English*, the error is not evidentiary weight; it is the failure to show the work.

The same defect is present here. The district court made detailed injury findings. It assigned four-figure sums. It articulated no step connecting the two. This is not merely a valuation that the appellants consider too low. It is an unexplained damages conclusion implausible in light of the court's own findings, and it satisfies *Hinkson*'s criteria for clear error.

### C. The awards are internally inconsistent.

The inconsistency runs in two directions. In one, the court produced unexplained divergence: children with materially comparable injury profiles received awards differing by multiples of three, five, and fifteen, with no identified difference in severity, duration, or medical intervention to justify the spread. In the other, the court imposed unexplained uniformity: every plaintiff—adult and child, teenager and infant—received an identical $1,000 in hedonic damages despite individualized findings describing categorically different losses. Both patterns reflect the same defect: a failure to connect findings to figures through any articulated methodology.

Appellants do not seek mechanical parity. Rather, they expect that within a single proceeding applying a single compensatory framework, materially similar injuries must yield rationally reconcilable damages outcomes—and materially different findings cannot yield identical ones. Under *Hinkson*'s test for clear error, unexplained internal contradiction is not discretionary calibration; it is implausible factfinding. *See also Fountila v. Carter*, 571 F.2d 487 (9th Cir. 1978).

### 1. The flat $1,000 hedonic award ignores the court's own individualized findings.

Hedonic damages require individualization; a flat award across materially different losses is a contradiction. After making plaintiff-specific findings describing categorically different deprivations, the court nonetheless assigned every plaintiff

the same $1,000 hedonic figure. 1-ER-6 ¶ 34, 1-ER-178. That is not discretion within a range—it is a failure to translate individualized findings into individualized compensation. If the injuries are distinct, the remedy must also be distinct—or the court must explain why not.

N.J.—a child on the autism spectrum whose therapy routine was dismantled—suffered an extreme meltdown on the flight from Hawai'i lasting nearly six hours. 1-ER-6 ¶ 414; 1-ER-136. B.D. "tries to really avoid the world" and stopped going outside. 1-ER-6 ¶ 304; 1-ER-102. D.J. was ten months old; the court made no hedonic findings beyond his existence in the household. 1-ER-6 ¶ 411; 1-ER-136.

These are not comparable losses. The court found them to be different. Then it assigned them the same number. A flat $1,000 applied identically to a teenager who lost a career path and an infant with no articulable hedonic experience contradicts the individualization the court's own legal framework—and *Castro*—requires. The court did not attempt to differentiate. It awarded a single round number to every plaintiff without exception.

The uniform $1,000 hedonic award cannot be defended as a reflection of the court's truncated injury timelines. Even if the court constrained the compensable period to a few weeks, the loss of enjoyment within those weeks varied wildly among the plaintiffs. T.F. spent his compensable window enduring emergency

interventions and acute asthma exacerbations. 1-ER-6 at 47-49. A methodology that assesses identical loss-of-enjoyment values to a hospitalized toddler and a displaced teenager—even over the same abbreviated timeline—is no methodology at all. It is arbitrary fiat.

### 2. Comparable minors received materially different awards without corresponding differences in found injuries.

Two comparisons illustrate the problem.

*T.F. ($3,000) versus V.D. ($10,000).* Both were very young—T.F. approximately twenty months, V.D. five. 1-ER-6 ¶ 105;1-ER-47; 16-ER-2490-93. T.F.'s acute illness spanned approximately three weeks and culminated in an emergency-room visit for uncontrollable vomiting, dry heaving, trouble breathing, and diarrhea. 1-ER-6 ¶¶ 108, 116-117;1-ER-47-49. V.D.'s symptoms—abdominal pain, vomiting, diarrhea, wheezing, and rash—lasted approximately one week. 1-ER-6 ¶¶ 63-73; 1-ER-34-36. T.F. had the longer duration, the more severe presentation, and the only emergency-room visit. V.D. received 3.3 times his award. The court identified no basis for the inversion.

*The Jessup household: 15-to-1 spread.* B.B.J. and B.J.J. each received $75,000. D.J. received $5,000; N.J. received $10,000. 1-ER-6 ¶ 29, 1-ER-176. All four lived in the same home, drank from the same water, and were displaced together to Arizona—separated from their father for five months. 1-ER-6 ¶¶ 392-93, 406, 411-

14; 1-ER-131; 1-ER-134; 1-ER-136. D.J. suffered fever, vomiting, diarrhea, rash, and eye irritation with contemporaneous medical records confirming onset. 1-ER-6 ¶ 411; 1-ER-136; 16-ER-2589-93. N.J.—autistic, with a mast-cell disease making him acutely vulnerable—suffered abdominal pain, vomiting, diarrhea, burning eyes, and cough; his therapy was dismantled; he suffered a six-hour meltdown during relocation. 1-ER-6 ¶¶ 413-14; 1-ER-136. The 15-to-1 spread between the highest and lowest Jessup awards corresponds to no identified difference in symptom severity, duration, or medical intervention. The court did not explain it.

### 3.    Internal inconsistency is clear error.

Age is not a legal proxy for compensable suffering—acute poisoning is no less real because the victim cannot narrate it. Yet the awards track age almost without exception. Arrayed by age, general-damages awards follow a near-monotonic progression: D.J. (ten months), $5,000; T.F. (approximately twenty months), $3,000; V.D. (five years), N.J. (four to five years), P.G.F., and D.F., each $10,000; K.F. (ten years), $25,000; B.D. (thirteen years), $20,000; N.F. (fourteen years), $50,000; B.B.J. and B.J.J. (teenagers), $75,000 each.

An unstated rule depressing awards in inverse proportion to age—without findings-driven justification—is not permissible calibration. It is an implied categorical rule the court never surfaced, never defended, and the law does not

sanction. Nowhere does the court articulate why a lower-awarded child suffered less harm than a higher-awarded comparator. No methodology—no severity scale, no per-day approach, no weighting of medical escalation—bridges the gap. Where record variables are materially similar, unexplained divergence signals that the awards do not track the findings under any valid legal measure.

This Court has corrected FTCA damages on this basis. In *Felder v. United States*, it reviewed a bench-trial wrongful-death judgment under Rule 52 and modified non-pecuniary awards unsupported by the evidence or predicated on impermissible considerations. 543 F.2d 657, 674-76 (9th Cir. 1976). The court held that non-pecuniary damages must reflect individualized findings—not categorical assumptions—and that rational uniformity must be maintained where the evidence warrants it. *Id.* Where disparities cannot be explained by findings, correction is required. An internally contradictory set of awards, untethered to articulated distinctions, is not discretionary valuation within a permissible range. It is a reviewable analytical defect satisfying *Hinkson'*s criteria for clear error.

## Conclusion

For these reasons, Appellants respectfully request that this Court vacate the damages awards regarding the appealing minors P.R.F, P.G.F, D.F., V.D., B.D., N.J., and D.J., and remand for redetermination of damages. On remand, the district court should (1) apply *Zhang*'s inferential standard in evaluating emotional-distress damages for the minors, and (2) explain a methodology that connects its injury findings to the amounts awarded. Because these findings are a bellwether template for hundreds of remaining claims, Rule 52's demand for findings-driven reasoning is not optional—it is the point of the bellwether process, which will only succeed if corrected now at its inception.

/s Chad Flores
Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Lyle Hosoda
Hosoda Law Group
3 Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawai'i 96813
(808) 524-3700

Kristina S. Baehr
Just Well Law, PLLC
2606 W 8th Street, Unit 2
Austin, TX 78703
(512) 994-6241

Frederick C. Baker
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
Chad Flores

Counsel for Appellants

## Certificate of Compliance

I am the attorney for Appellants. This brief contains 6,817 words, including 0 words manually counted in any visual images, and excluding the items exempted by Federal Rule of Appellate Procedure 32(f). The brief's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6). I certify that this brief complies with the word limit of Ninth Circuit Rule 32-1.

s/Chad Flores
Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Counsel for Appellants